IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| **Philip Tjaden,** | : | |
| Plaintiff, | : | |
| | | Case No. 3:20-cv-00025-TPK |
| vs. | : | |
| **Andrew Saul,** | : | Magistrate Judge Kemp |
| **Commissioner of** | | |
| **Social Security,** | : | |
| Defendant. | : | |

**OPINION AND ORDER**

Plaintiff Philip Tjaden filed this action seeking review of a final decision of the Commissioner of Social Security.  That decision, issued by the Appeals Council on December 6, 2019, denied his applications for social security disability benefits and supplemental security income.  Plaintiff filed a statement of errors on May 8, 2020 (Doc. 8) to which the Commissioner responded on July 20, 2020 (Doc. 11).  The parties have consented to final disposition of this case by a United States Magistrate Judge.  For the following reasons, the Court will **SUSTAIN** the statement of errors (Doc. 8) and **REMAND** the case the case to the Commissioner for further proceedings pursuant to 42 U.S.C. §405(g), sentence four.

**I.  INTRODUCTION**

Plaintiff protectively filed his applications on March 30, 2016, alleging that he became disabled on March 4, 2015.  After initial administrative denials of his claim, Plaintiff appeared at a hearing held before an Administrative Law Judge on June 20, 2018.  A vocational expert, Charlotta J. Ewers, also testified at the hearing.

The Administrative Law Judge issued an unfavorable decision on October 31, 2018.  In that decision, she first found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2017, and that he had not engaged in substantial gainful activity since the alleged onset date.  The ALJ next concluded that Plaintiff suffered from severe impairments including lumbar spine disc bulging and multi-level stenosis; cervical spine hypolordosis and facet arthrosis; obesity; history of umbilical repair; schizophrenic disorder; depressive disorder; anxiety disorder; somatoform disorder; paranoia; panic disorder with agoraphobia; and gender dysphoria.  However, the ALJ also found that none of these impairments, taken singly or in combination, met the criteria for disability found in the Listing of Impairments.

Moving to the next step of the sequential evaluation process, the ALJ found that Plaintiff could perform a reduced range of light work. She concluded that Plaintiff could carry out the exertional demands of light work but could only push or pull occasionally with his legs and feet and could only occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl. He could never climb ladders, ropes, or scaffolds or work at unprotected heights or around dangerous machinery. He could not drive commercial vehicles but he could frequently balance. From a mental standpoint, he could tolerate occasional interaction with supervisors and coworkers but could not perform tandem or shared tasks. He could not work in an environment where there was over-the-shoulder supervision, he could interact occasionally with the public but not in a customer service capacity, and he could adapt to infrequent changes in the workplace so long as those changes were explained to him.

The ALJ determined that with these limitations, Plaintiff could not perform his past relevant work as a tractor-trailer driver or taxi driver. At the hearing, the vocational expert testified that someone with the residual functional capacity determined by the ALJ could do certain light jobs including warehouse checker, merchandise marker, and electronics worker. The ALJ accepted this testimony as well as the testimony that these jobs exist in significant numbers in the national economy. As a result, she concluded that Plaintiff was not disabled within the meaning of the Social Security Act.

In his statement of errors, Plaintiff raises two issues. He asserts that the ALJ did not properly evaluate the medical evidence, determine a residual functional capacity, and judge his symptom severity. He also contends that the ALJ did not correctly evaluate the mental health medical source opinions.

## II. STANDARD OF REVIEW

As this Court said in *Jeter v. Comm'r of Soc. Sec. Admin.*, 2020 WL 5587115, at *1–2 (S.D. Ohio Sept. 18, 2020)**,**

> Judicial review of an ALJ's non-disability decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007). Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met—that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.' " *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of*

*Soc. Sec.,* 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance...." *Rogers*, 486 F.3d at 241 (citations and internal quotation marks omitted); *see Gentry*, 741 F.3d at 722.

The other line of judicial inquiry—reviewing the correctness of the ALJ's legal criteria—may result in reversal even when the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers,* 582 F.3d at 651 [quotations and citations omitted].

### III. FACTUAL BACKGROUND

The Court will begin its review of the factual background of this case by summarizing the testimony given at the administrative hearing. It will then recite the pertinent information found in the medical records.

Plaintiff, who was 41 years old at the time of the hearing, first testified that he was living with a friend in Kettering, Ohio. He drove very rarely and did not own a car. At the time of the hearing, he was watching his friend's two children on a daily basis since it was summer vacation. He had attended college and had earned a two-year degree in electronic engineering. More recently, he had started taking online courses but stopped as a result of being unable to afford the tuition.

The last job Plaintiff had was driving a truck. He stopped working due to back injuries sustained in a motor vehicle accident. He did attempt to go back to work after the accident but that attempt was unsuccessful. Plaintiff had worked for several other trucking companies before that and also drove a taxi.

At the time of the hearing, Plaintiff was not receiving treatment for his back, nor was he taking any prescription medication for that condition. He did take medication for his mental health conditions, though, and was seeing a therapist, a psychologist, and a psychiatrist. He believed he could not work due to issues related to interacting with others, in part due to his gender identity. He also suffered from fatigue and vibrations in his legs, a problem which was worse at night than during the day. He attributed his fatigue to difficulty sleeping due to nerve pain.

On a daily basis, Plaintiff watched his friend's children, did household chores, and occasionally did grocery shopping. He also interacted with his sister on an infrequent basis and

said that he had anger issues.  He could stand for an hour and had pain if he sat too long.  He no longer wanted to drive a truck because he could not deal with problems caused by other drivers.

The vocational expert, Ms. Ewers, first classified Plaintiff's past truck driving and taxi driving work as medium and semi-skilled.  Someone who could not engage in commercial driving could not perform those jobs, she said.  She was next asked questions about a person who had the ability to perform light work with the various restrictions contained in the ALJ's residual functional capacity finding.  In response, she identified jobs like warehouse checker, marker, and electronics worker.  If the person was off-task for at least 15% of the time, however, that individual could not be competitively employed, and the same would be true for someone absent from work two or three times per month, who had to work in total isolation, or who had emotional outbursts every other day.

The pertinent medical records show, first, that Plaintiff was injured in an accident on March 4, 2015.  He underwent chiropractic treatment after the accident.  On October 14, 2015, at a workers' compensation examination, he reported constant severe low back pain and intermittent pain and numbness in other parts of his body but said that he could sit and walk satisfactorily.  He walked with a limp and demonstrated some mild muscle spasm as well as limitations in his range of motion.  Straight leg raising was positive on the right.  The examiner, Dr. Weaver, concluded that Plaintiff had a 15% whole body impairment.  (Tr. 409-10).  Later that year, he demonstrated a full range of motion on examination without swelling or tenderness and was diagnosed with midline low back pain without sciatica.  (Tr. 430-31).  In April of 2016, his treating physician, Dr. Fogle, checked a box indicating that he was "unemployable," referring to her treatment notes as support for that conclusion. The notes show that Plaintiff reported that low back pain was his most significant condition.  He was taking pain medication as well as medication for a mood disorder.  Plaintiff underwent hernia repair surgery in 2017 but, as he testified, did not get much if any treatment for his back disorder that year.

The physical therapy notes are extensive and begin on December 10, 2015.  Plaintiff's beginning diagnosis was lumbago with sciatica and he reported, among other symptoms, trouble sleeping, walking, and functioning generally.  He also described a sensation of vibration in his legs and said that his activities of daily living were severely impaired.  His mobility was guarded and his lumbar range of motion was limited.  His gait was slow and antalgic and his back was hypersensitive to palpation.  Additional notes show that he was motivated but that his pain limited his exercise tolerance and he needed exercise breaks secondary to pain.  Plaintiff also experienced dizziness when attempting certain activities including standing fully erect and doing squatting exercises.  After ten sessions he was still having difficulty bending, carrying, and picking objects up off the floor.  However, his walking posture had improved, although he displayed blurred vision and swaying upon standing and his movements were slow and guarded.  That was true even after thirty sessions, and he was noticed relying on furniture when walking to offset his lack of balance.  After 49 sessions, his activities of daily living were still being described as moderately impaired, his movements were "slow, awkward, [and] guarded ... requiring constant cueing," and his lower back functioning was characterized as "50%

disability." He could only stand for about ten minutes at that time. (Tr. 616-18).

The only opinion evidence relating to Plaintiff's ability to perform specific physical work-related functions came from two state agency physicians, Drs. Knierem and Manos. Both of them concluded, in opinions rendered following the physical therapy sessions but which made no mention of those records, that Plaintiff suffered from severe spine disorders including sprains and strains but that he could do a limited range of light work with postural and environmental limitations.

There is also a substantial amount of evidence in the record concerning Plaintiff's mental impairments. Many of the treatment notes are handwritten and some appear in the record sideways or upside down. His treating psychologist, Dr. Sowald, concluded on March 17, 2017, that Plaintiff was markedly impaired in his ability to complete a workday or work week without interruption from psychologically-based symptoms, to accept criticism from supervisors, to respond appropriately to changes in the work setting, or to travel in unfamiliar places. He had moderate limitations in a number of other areas, and she did not think he could be gainfully employed. (Tr. 1367-68). His therapist, Linda Fenner, a licensed social worker, concluded on a form she signed on July 16, 2018, that Plaintiff exhibited symptoms including sleep and mood disturbances, social withdrawal, decreased energy, generalized anxiety, and difficulty thinking or concentrating. In her view, he had either marked or extreme limitations in most of the work activities related to concentration, persistence, and pace, and he also had extreme limitations in his ability to relate to others and to control his behavior in a work setting. She did not think he could perform work without missing at least two days per month or being off task more than 15% of the time. (Tr. 1501-04). Further explaining her opinions, she stated in August of 2018 that she believed Plaintiff's gender dysphoria would be disruptive to others and that his anxiety made it hard for him to be around groups of people or to adapt to society. (Tr. 1507).

State agency reviewers also commented on Plaintiff's mental impairments and their impact on his ability to work. Both Drs. Tangeman and Souder thought that Plaintiff was only moderately limited in the performance of a variety of work activities, but they also concluded that he was limited to superficial and infrequent contact with others and would be most productive working apart from others, although he could occasionally work alongside them. Neither had the opportunity to consider the later opinions of Dr. Sowald and Ms. Fenner.

## IV. DISCUSSION

### A. Residual Functional Capacity

In his first claim of error, Plaintiff argues that the ALJ essentially "cherry-picked" the record in order to find support for her finding that Plaintiff was able to perform the standing, walking, lifting, and balancing requirements of light work and that she ignored substantial objective evidence to the contrary. He also notes that his subjective complaints were fully corroborated by the objective evidence and should have been given more credibility. The

Commissioner responds that the ALJ considered the record in its entirety, including Plaintiff's medical history, the pertinent medical opinions, and Plaintiff's subjective testimony in reaching her decision as to Plaintiff's residual functional capacity, and that the ALJ was entitled to resolve conflicts in the evidence as part of that process.

The ALJ began her analysis of this issue by giving great weight to the opinions of the two state agency reviewers, both of whom determined that Plaintiff could do light work with restrictions. She gave no weight to Dr. Weaver's opinion "because the BWC disability ratings appear to be diagnosis driven" as opposed to focusing on functional impairment. (Tr. 29). She also discounted Dr. Fogle's opinion that Plaintiff was not employable because it lacked any functional analysis. Lastly, she determined that Plaintiff's subjective description of his symptoms was not fully consistent with the record because he received only conservative treatment for his back injury and that at the time of the hearing his only treatment was occasional doses of ibuprofen. He also engaged in what she described as a full range of daily activities. Based on these considerations, she concluded that it was reasonable to find that he could engage in a limited range of light work activities.

Plaintiff characterizes the ALJ's review of the evidence about his physical capacity as "weak" and "cursory" and contends that she did not mention many of the objective clinical findings that supported his complaints, including, most significantly, observations made by the physical therapist to the effect that Plaintiff was unsteady on his feet and unable to perform many physical activities. He also points out the presence of notations in his examination records about his pain and how difficult he found it to sleep and walk. Because he does not directly attack the ALJ's credibility finding (for example, he does not argue that she applied an incorrect legal standard to that question), the Court's review is limited to determining whether, generally, the record contains substantial support for the ALJ's decision.

Although an ALJ's decision can be sustained when the record supports it, even if there is also substantial evidence to support the opposite conclusion, an ALJ errs when she disregards a substantial amount of the objective evidence which, if credited, would support additional work-related limitations beyond those found by the ALJ. *See, e.g., Minor v. Comm'r of Social Security*, 513 Fed.Appx. 417, 437-38 (6th Cir. Jan. 24, 2013)(ALJ decision could not be upheld because he "did not consider a large portion of the objective medical evidence"). It is also true that while an ALJ need not discuss each and every item of evidence, the "ALJ must consider all the record evidence and cannot 'pick and choose' only the evidence that supports his [or her] position." *Hawthorne v. Comm'r of Soc. Sec.*, 2014 WL 1668477, at *11 (S.D. Ohio Apr. 25, 2014). And as the Court of Appeals said in *Karger v. Comm'r of Soc. Sec.*, 414 F. App'x 739, 753 (6th Cir. 2011), "[w]hile an ALJ is not required to discuss every piece of medical opinion evidence," reversible error can occur when "the ALJ [does] not nearly discuss enough of that evidence to enable [a reviewing court] to determine whether substantial evidence supports the determination that [the claimant's] impairments do not render her disabled."

This Court has noted that "that there is a distinction between what an ALJ must consider

and what an ALJ must cite to in a written decision." *Swartz v. Comm'r of Soc. Sec.*, 2011 WL 4571877, at *7 (S.D. Ohio Aug. 18, 2011), *report and recommendation adopted*, 2011 WL 4571873 (S.D. Ohio Sept. 30, 2011). But this Court has also recognized that "it is true that '[a]n ALJ's failure to consider an entire line of evidence falls below the minimal level of articulation required,'" *see Williamson v. Comm'r of Soc. Sec.,* 2013 WL 394572, at *3 (S.D. Ohio Jan. 31, 2013), *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir.1995).

By failing even to acknowledge the large number of observations of Plaintiff's physical limitations found in the physical therapy notes (corroborated to some extent by Dr. Fogle's notes as well), and by relying heavily on state agency reviewers who similarly failed to mention those findings, the ALJ did not adequately explain her decision and did not satisfy the Court that she discharged her duty to consider all the relevant evidence. At a minimum, the ALJ should have acknowledged that the therapy notes contained a large number of observations which are totally incompatible with the type of walking, standing, and balancing needed to do even the limited range of light work of which she believed Plaintiff to be capable. She should also hav explained why she found those notes not to be credible or consistent with the other evidence of record which, as noted, includes an opinion from a treating source that Plaintiff was not employable. Consequently, remand is required so that these issues can be more fully addressed.

### B. Mental Health Opinions

Plaintiff's second argument focuses on the opinions of the treating sources and the state agency psychologists who assessed his mental residual functional capacity. He asserts that the ALJ should have given more weight to the opinions both of his psychologist and therapist and the state agency reviewers, all of whom, in his view, identified symptoms of his mental impairments which were not compatible with working. To evaluate this claim, the Court must first set out the ALJ's reasoning behind her decision about Plaintiff's mental residual functional capacity.

The ALJ said that she gave "some" weight to all of the opinions on this subject. She declined to give any greater weight to the opinions of Dr. Sowald because they were "not well supported by medically accepted clinical and laboratory diagnostic techniques" and because they were "inconsistent with other substantial evidence in the record." (Tr. 25). She noted, in support of these statements, that Plaintiff never testified to being uncomfortable traveling to unfamiliar places or having problems with supervisors and that, after his accident, he was able to take online classes and to maintain a relationship with his friend and her children. Earlier, the ALJ had summarized the treatment notes as showing that Plaintiff generally had an appropriate affect, good attention and concentration, and that he had increased his socialization as therapy progressed as well as his comfort level with his upcoming gender transition, although at times he was also described as experiencing some depression, social withdrawal, and lack of interest and energy. She explained that she gave only some weight to Ms. Fenner's opinion as well because there was only a one-year treating relationship between her and Plaintiff, because a social worker is not an "acceptable medical source," and because the record did not support Ms. Fenner's

findings of extreme limitations or her conclusions about how often Plaintiff would miss work or be off task.

The ALJ also said that she gave only some weight to the opinions of the state agency psychologists, Drs. Tangeman and Souder. She noted, in support of that decision, that neither of them had examined Plaintiff nor done any psychometric testing. However, she did not explain which portions of their opinions she did not fully credit, and she commented that she was giving Plaintiff the benefit of the doubt with regard to the social discomfort caused by his gender dysphoria.

First, the Court notes that it is somewhat unusual that most of the discussion of the mental health opinions appears in the portion of the administrative decision devoted to determining if Plaintiff's mental health impairments were severe. In the portion where the ALJ made her residual functional capacity finding, she appears simply to have translated the evaluations done by the state agency reviewers about whether Plaintiff met the "B" criteria of the Listing of Impairments into functional restrictions, even though "[i]t is well established that the paragraph B criteria used at steps 2 and 3 of the sequential analysis 'are not an RFC assessment,'" *see Andree v. Comm'r of Soc. Sec.,* 2012 WL 1094662, at *8 (W.D. Mich. Mar. 13, 2012), *report and recommendation adopted*, 2012 WL 1094661 (W.D. Mich. Mar. 30, 2012). Her findings included attributing to Plaintiff the ability to interact with the public occasionally but in ways other than as a customer service representative. It is not entirely clear how the ALJ arrived at this particular restriction or whether it is a correct interpretation of the limitation imposed by the state agency reviewers concerning Plaintiff's inability to tolerate more than infrequent and superficial contact with others.

Plaintiff argues that the ALJ's residual functional capacity finding - namely, that he could tolerate occasional interaction with supervisors and coworkers, could not perform tandem or shared tasks, could not work in an environment where there was over-the-shoulder supervision, could interact occasionally with the public but not in a customer service capacity, and could adapt to infrequent changes in the workplace so long as those changes were explained to him - is not consistent with any of the opinions of record. In particular, he asserts that the limitations on his contact with others found in the state agency reviewers' opinions were not accommodated by the ALJ's functional capacity finding and that the ALJ lacked the expertise simply to reject those conclusions. The Commissioner, while vigorously defending the ALJ's rejection of portions of the opinions of Dr. Sowald and Ms. Fenner, does not directly comment on this latter argument.

At a minimum, the issue of how much public interaction Plaintiff can tolerate needs clarification. Did the ALJ reject the state agency reviewers' opinions about Plaintiff's social interaction limitations or did she view her RFC finding as consistent with those opinions? If the former is true, why were those particular opinions given only some weight? Was it based on the same reviewers' assessment of the "B" criteria even though that assessment is not intended to be a finding about residual functional capacity? And what is the support found in the record for the finding that Plaintiff had ability to deal with the public occasionally but just not as a customer

service representative? Consequently, while the second claim of error, standing alone, might not fully support remand, since the case is being remanded on the first issue, the ALJ should, as part of that remand, also give this matter further consideration and provide a more complete explanation of her findings.

## V.  CONCLUSION AND ORDER

For the reasons stated above, the Court **SUSTAINS** the statement of errors (Doc. 8) and **REMANDS** the case to the Commissioner for further proceedings pursuant to 42 U.S.C. §405(g), sentence four

 /s/ Terence P. Kemp
**Terence P. Kemp**
**United States Magistrate Judge**